### Illinois Central Railroad Company, et al. v. Tolar's Administrator.

(Decided March 10, 1916.)

### Appeal from McCracken Circuit Court.

1. Railroads—Crossing Accident.—Instructions.—An instruction in a crossing accident case, teling the jury that if they believed from the evidence that plaintiff's decedent was drunk, or materially under the influence of intoxicants when he undertook to cross defendant's track, then it was his duty to use such care in crossing said track as is usually expected of a reasonably prudent man when sober, is not erroneous because of the clause "or materially under the influence of intoxicants," or of a failure to define the word "materially."

2. Railroads—Instructions—Error.—An instruction in a crossing accident case, telling the jury that if the decedent had a defective hearing, then it was his duty to use such increased care in crossing said track as would be equal in measure to such defect, without authorizing any finding on the facts submitted to the jury, is not prejudicial where, from the instructions considered as a whole, the jury could not have failed to understand what would constitute contributory negligence on the part of decedent.

3. Railroads—Pleading—Negligence — Specification. — An allegation that the defendant's engineer failed to keep a lookout and failed to take such care as would protect the public at the crossing, is sufficient to charge that he failed to use ordinary care to avoid injuring decedent after his peril was discovered or might have been discovered by the exercise of ordinary care.

4. Railroads—Crossing Accident—Contributory Negligence—Qualification of Instruction.—In a railroad crossing accident case, evidence considered and held to authorize the giving of an instruction telling the jury to find for plaintiff, notwithstanding the decedent's contributory negligence, if they believed from the evidence that defendant failed to exercise ordinary care to avoid killing decedent after his peril was or might have been discovered by the exercise of ordinary care.

5. Railroads—Crossing Accident—Instructions.—An instruction with respect to an unusually dangerous crossing is not prejudicial because it refers to the physical facts rendering the crossing unusually dangerous.

6. Evidence—Rejection—Subsequent Admission—Error.—Where a witness is subsequently permitted to answer, a party is not prejudiced by the former refusal of the court to permit him to do so.

WHEELER & HUGHES, R. V. FLETCHER and TRABUE, DOOLAN & COX for appellants.

CLAY & REED, SANDERS E. CLAY and ROSCOE REED for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

This is a suit by the administrator of the estate of Gus Tolar, deceased, against the Illinois Central Railroad Company and its engineer, A. L. Hatch, to recover damages for the death of the decedent. The trial before a jury resulted in a verdict and judgment in favor of plaintiff for $10,000.00. The railroad company appeals.

The accident, which resulted in the death of Tolar, occurred at 5:23 P. M., December 14th, 1914, at what is known as "Frey's Crossing," in the northern limits of the city of Mayfield. At this point the Paducah and Mayfield road and the railroad intersect. Both the highway and the railroad pass through a cut within forty or fifty feet of the crossing. The embankment is from nine to twelve feet high and extends north for a distance of several hundred feet. Between the railroad and street are several residences and a business house. The train crew cannot see a traveler approaching the crossing until he is within about thirty feet thereof, nor can a traveler until he reaches that point see an approaching train.

On the occasion of the accident Tolar was driving an oil wagon belonging to the Indian Refining Company. Hitched to the wagon were two mules and a horse, the mules being abreast and the horse in the lead. The dis-

tance from the head of the horse to the wagon proper was about twenty-three feet. The vehicle consisted of a wagon truck, which supported a steel oil tank four or five feet in diameter and eight feet long. The tank contained gasoline and oil. On top of the tank was the driver's seat, protected by a combined canvas and wooden top. The lines passed through the front of the enclosure. Immediately in front of the driver was a glass window, and one of the witnesses says that there were doors on the side with glass in them. Both Tolar and the train were approaching the crossing from the north. The team had crossed the track, and as the tank was passing over it was struck by the train four or five feet from the front end. The wagon was demolished and Tolar and the tank hurled several feet away.

Several witnesses for plaintiff testified that the whistle was blown at the yard limits, which are located about a half-mile from the crossing, and that after that time no further signals were given until the alarm blast was blown immediately before the collision. They also testified that at the time of the accident the train was going at from thirty-five to fifty miles an hour. It further appears that when the train left Paducah its schedule was changed so as to make its running time forty minutes behind the regular schedule. Some of the witnesses for plaintiff also stated that the engine bell was not being rung. An old engineer, who had formerly been in the employ of the defendant before he had been discharged because of a wreck, stated that the train could have been stopped in three hundred feet. Two or three witnesses stated that after the collision the train ran from one hundred to two hundred and fifty yards.

A large number of witnesses who testified for the defendant stated that the whistle was not only sounded at the yard limit post, but also for the crossing. In addition to these signals, several testified to hearing the alarm blast and to the fact that the bell was ringing. The engineer says that he observed Tolar's team when three or four hundred feet away. He immediately sounded the alarm blast and put on his emergency brakes. When he first discovered the wagon on the track the train was moving at about twenty-five miles an hour. At the time of the collision the speed of the train had been reduced to twelve or fourteen miles an hour. After the collision the wheels on all of the coaches had to be

renewed because the force of the emergency stop flattened them so they could not be used. · As the tank was filled with gasoline, he, fearing fire, moved the train a hundred and fifty or two hundred and fifty yards south of the crossing. He blew the station whistle one-half mile north of the crossing. He blew the road crossing signal about a quarter of a mile away. The bell on the engine was ringing automatically. On cross-examination he stated that when he was about eight car lengths, or four hundred and eighty feet, away from the crossing, he saw the first horse on the track. When six car lengths away he applied the brakes. He did not apply them sooner because there was no need of putting on the brakes, as the decedent could have gotten off if he had whipped his horses up. When the brakes were applied the front horse was crossing the track. The wagon was barely moving. Mr. Sullivan, who conducts a grocery located near the crossing, saw Tolar approaching, and, fearing an accident, went out on the porch or in the roadway and called to him several times to "Look out! the train is coming," or "the train will get you." It was also shown that Tolar was partially deaf and acted as if he were under the influence of whiskey or some narcotic. However, plaintiff's witnesses who saw Tolar just before the accident claim that he was perfectly sober and that they did not detect the smell of liquor on his breath.

1. Complaint is made of instruction No. 7, which is as follows:

"The court further instructs you that if you shall believe from the evidence that plaintiff's decedent was drunk, or materially under the influence of intoxicants, when he undertook to cross defendant's track on the occasion mentioned to you in evidence, then it was his duty to use such care in crossing said track as is usually expected of a reasonably prudent man when sober, under like or similar circumstances; and the court further instructs you that if you shall believe from the evidence that plaintiff's decedent Tolar had a defective hearing at the time he undertook to cross said track, then it was his duty to use such increased care in crossing said track, as would be equal in measure to such defect."

It is insisted that the instruction is erroneous because of the use of the words "or materially under the influ-

ence of intoxicants.'' It is suggested that the word ''materially'' was not defined and the jury had to speculate as to what constituted material intoxication. Some words are so simple and their meaning so generally understood that an attempt to define them results only in confusion and doubt. It was not necessary, we think, to define the word ''materially.'' An ordinary jury may be trusted to pass on the question of drunkenness and its effect on a man's conduct without the aid of either definition or diagram. In giving instructions in cases like this, it is customary to use only the word ''drunk.'' It seems to us, therefore, that the additional clause, ''or materially under the influence of intoxicants,'' rather diminished than added to the meaning of the word ''drunk,'' and could not, therefore, have been prejudicial to defendant. In a case of this kind, intoxication is not negligence, as a matter of law. It is simply a circumstance from which the jury may find the existence of negligence as a fact. Hence, when the question of drunkenness is involved, it is only necessary to give an instruction similar to the one under consideration.

The point is also made that the instruction under consideration is merely abstract and does not authorize any finding one way or the other, based on the facts submitted for the consideration of the jury. It may be conceded that where the deafness of the decedent, or other circumstances requiring increased care on his part, are involved, it is the better practice to incorporate such questions in the instruction on contributory negligence, and tell the jury that if the decedent failed to exercise such care and, but for this, would not have been struck and killed, they should find for the defendant. L. & N. R. R. Co. v. Gardner's Admr., 140 Ky., 772; Southern Ry. in Ky. v. Sanders, 145 Ky., 679. However, we do not regard the court's failure to do this in the present instance as prejudicial. When the instruction complained of is considered in connection with the other instructions given, we doubt not that the jury fully understood what would constitute contributory negligence on the part of the plaintiff.

2. Complaint is also made of the qualification of the instruction on contributory negligence by instruction No. 4, which told the jury, in substance, to find for plaintiff, notwithstanding the decedent's contributory negligence, if they believed from the evidence that the de-

fendant failed to use ordinary care to avoid killing the decedent after his peril was or might have been discovered by the exercise of ordinary care. It is claimed that neither the pleadings nor facts authorized such an instruction. The acts of negligence relied on in the petition are: Failure to warn; excessive speed; failure "to keep any lookout for persons using said crossing"; and failure "to take such care as would protect the public at said usually and exceptionally dangerous crossing." We conclude that a failure to use ordinary care to avoid injuring decedent who was a member of the public, after his peril was or might have been discovered by the exercise of ordinary care, was necessarily included in the charge that the engineer failed to keep a lookout and failed to take such care as would protect the public at the crossing. But it is argued that the engineer's evidence shows that when he discovered the decedent he did all in his power to avoid the injury, and that he could not, because of the cut and the consequent obstruction of his view, have discovered him any sooner. On cross-examination, the engineer stated that he saw decedent himself when three or four hundred feet away, and saw the leading horse when about eight car lengths, or four hundred and eighty feet, away. At that time the lead horse was on the track. We think the evidence is sufficient to show that, notwithstanding the obstruction of his view, he could have seen the lead horse when he emerged from behind the embankment at a point about thirty feet from the track. Instead of seeing the horse at that time, he did not see it until it was on the track. In the meantime, the horse had traveled at least twenty-five or thirty feet, and was traveling only about three or four miles an hour, or at the rate of from four and one-half to six feet a second. In other words, from five to seven seconds elapsed between the time that the engineer could have seen the horse and the time when he actually saw it. in the meantime, the train, if traveling at the rate of twenty-five miles an hour, would have gone from one hundred and eighty-five to two hundred and sixty feet. If traveling at a faster rate, it would have gone much further. In view of the uncontradicted evidence of a former engineer, who stated that owing to the lightness of the train and the steepness of the grade the train could have been stopped in about three hundred feet, and the further fact that if a proper lookout had been

kept the lead horse could have been seen when the train was considerably over five hundred feet away, we conclude that the question whether or not the defendant's engineer, by the exercise of ordinary care, could have avoided the injury after the peril of the decedent was discovered or might have been discovered by the exercise of ordinary care, was for the jury. It follows that the trial court did not err in qualifying an instruction on contributory negligence by instruction No. 4.

3. In instructing the jury with reference to the dangerous character of the crossing and the duty of the defendant, in case they believed it was more than ordinarily dangerous, to provide such additional signals as were reasonably necessary to give notice of the approach of the train, the court used the following language:

"If the crossing was used by many persons, or that by reason of curves in defendant's track, or by reason of the embankment, mentioned to you in evidence, or other obstruction of the view of the railroad, or of the hearing of the approach of the train, * * *" etc.

This instruction is attacked on the ground that it specifies the physical conditions brought out in the evidence instead of submitting to the jury the simple question whether or not the crossing was unusually dangerous. While the trial court might, with propriety, have given an instruction similar to the one directed by this court to be given in the case of Southern Ry. in Ky. v. Winchester's Adm'x., 143 Ky., 38, we are not inclined to hold that the court's reference to the physical facts rendered the instruction erroneous. An instruction containing language very similar to the above was approved by this court in the case of L. & N. R. R. Co. v. Lucas' Adm'r., 30 R., 364, 98 S. W., 308.

4. Complaint is made of the fact that plaintiff's witness, Jake Perkins, was not permitted to answer a question with reference to a statement alleged to have been made by him on another occasion. It is true the court did not permit him to answer at that particular time, but later the question was again asked him and he was permitted to answer. Under these circumstances, there was no error.

Other alleged errors are relied on, but we do not regard them as of sufficient importance to authorize a reversal.

Judgment affirmed.